889 So.2d 831 (2004)
DEPARTMENT OF CITRUS, Appellant,
v.
GRAVES BROTHERS CO., Evans Properties, Inc., Southern Garden Groves Corp., the Latt Maxcy Corp., Fellsmere Joint Venture LLP, Oak Hammock Groves, Ltd., Silver Strand III, Partnership, and Barron Collier Partnership, Appellees.
No. 2D03-2276.
District Court of Appeal of Florida, Second District.
October 20, 2004.
Rehearing Denied January 4, 2005.
Barry Richard of Greenberg Traurig, P.A., Tallahassee; Elliot B. Kula of Greenberg Traurig, P.A., Miami; and Hank B. Campbell and Monterey Campbell of Gray Harris, Lakeland, co-counsel for Appellant.
Michael P. McMahon and Virginia B. Townes of Akerman Senterfitt, Orlando and Steven B. Gold, Clewiston, co-counsel for Appellees.
DAKAN, STEPHEN L., Associate Senior Judge.
The Department of Citrus ("DOC") appeals the declaratory judgment of the trial court entered in favor of the Appellees ("Growers") declaring that the tax imposed upon the Growers by the provisions of *832 section 601.15, Florida Statutes (2002), violates that portion of the First Amendment to the United States Constitution regarding free speech. We affirm.
Section 601.04(1)(a) creates within the DOC the Florida Citrus Commission, which is made up of persons who are actively engaged in growing, shipping, or processing citrus fruit in the state of Florida. Members are appointed by the Governor and have the responsibility of carrying out the provisions of the Florida Citrus Code, chapter 601, that apply to the DOC. §§ 601.04(2)(a), .05.
Section 601.15 imposes a tax on each box of citrus fruit grown and placed into the primary channel of trade in Florida. Only the Growers and other members of the state citrus industry pay this tax. Section 601.15(7) provides that all such taxes collected shall be accounted for in a special fund designated as the Florida Citrus Advertising Trust Fund and further specifies certain limited uses of these funds together with a mandate that the remainder of the funds, approximately seventy-three percent, be used by the DOC exclusively for advertising and other associated activities promoting the sale of citrus products. Thus, as found by the trial court, the primary purpose of this tax is generic advertising.
Two decisions of the U.S. Supreme Court deal with the application of the First Amendment to taxes like the one imposed by section 601.15. In Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997), the Court held that the provisions of the Agricultural Marketing Agreement Act of 1937, which provided, among other things, for the summer fruit industry in California to fund a generic advertising program, did not violate any free speech provisions of the U.S. Constitution. The majority based its opinion on its finding that the regulatory scheme was part of a broader collective enterprise that displaced competition in a number of markets and under which the growers' freedom to act independently was constrained by the scheme. 521 U.S. at 469, 117 S.Ct. 2130. It also noted that the growers and producers were expressly exempted from antitrust laws. Id. at 461, 117 S.Ct. 2130.
In United States v. United Foods, Inc., 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001), the Court dealt with the Mushroom Promotion, Research and Consumer Information Act. The law provided for the establishment of a Mushroom Council (similar to the Florida Citrus Commission) and for an assessment on mushroom producers and importers that, according to the Court's finding, was spent mostly for generic advertising to promote mushroom sales. 533 U.S. at 408, 121 S.Ct. 2334. The Court found that the assessment was unconstitutional compelled speech. Id. at 416, 121 S.Ct. 2334.
The Court distinguished its holding in Glickman by stating that in that case the Court had proceeded on the premise that the producers were bound together and required by the law to market their products according to cooperative rules. Id. at 412, 121 S.Ct. 2334. The United Foods Court pointed out that the mushroom market had not been collectivized, exempted from antitrust laws, subjected to uniform price or otherwise subsidized through price supports or restrictions on supply. Id. at 413, 121 S.Ct. 2334. A logical interpretation of United Foods is that the Supreme Court believed that if a tax is assessed only on a specific industry and if the moneys generated by that tax are spent mostly for generic advertising to promote the sale of the product of that specific industry, then the tax violates the free speech provisions of the First Amendment.
*833 Three federal intermediate courts of appeal have considered similar issues since the decision in United Foods. Michigan Pork Producers Ass'n v. Veneman, 348 F.3d 157 (6th Cir.2003), petition for cert. filed, 72 U.S.L.W. 3539 (Feb. 19, 2004), dealt with the provisions of the Pork Promotion, Research and Consumer Information Act. The industry was assessed money used primarily for generic advertising that promoted the sale of pork. The court concluded that the provisions of the Pork Act were nearly identical to the Mushroom Act and were, therefore, unconstitutional under the analysis of United Foods. 348 F.3d at 162-63.
Unlike United Foods, the court in Michigan Pork Producers Ass'n also considered (and rejected) the government's contention that the provisions of the Pork Act were "government speech" and were, therefore, protected rather than prohibited by the First Amendment. 348 F.3d at 161-62. The court noted that the pork industry had extensive control of the promotional activities and these activities could not be attributed to the government. Id. at 161. The court also noted that the primary purpose of the Act was to strengthen the market position of the pork industry; that the funding did not come from general tax revenues, but only from the mandatory assessments; and that the government exercised only limited oversight over the advertising programs. Id. at 161-62.
In Livestock Marketing Ass'n v. United States Department of Agriculture, 335 F.3d 711 (8th Cir.2003), cert. granted in part sub nom. Veneman v. Livestock Marketing Ass'n, ___ U.S. ___, 124 S.Ct. 2389, 158 L.Ed.2d 962, and cert. granted in part sub nom. Nebraska Cattlemen, Inc. v. Livestock Marketing Ass'n, ___ U.S. ___, 124 S.Ct. 2390, 158 L.Ed.2d 962 (2004), the Court held that the provisions of the Beef Promotion and Research Act of 1985 that imposed an assessment only on beef producers and importers, which was used "at least 50%" for generic advertising promoting the sale of beef products, were unconstitutional under the United Foods analysis.
The Ninth Circuit Court of Appeals dealt with the provisions of the state of California's Grape Code in Delano Farms Co. v. California Table Grape Commission, 318 F.3d 895 (9th Cir.2003). Like the federal Mushroom Act, Pork Act, and Beef Act, the grape industry was assessed a tax that was spent primarily on generic promotional activities. 318 F.3d at 897. The court held that the California statute was similar to the one at issue in United Foods and was, therefore, unconstitutional compelled speech. Id. at 897-900.
We are persuaded by the reasoning of the courts in Michigan Pork Producers Ass'n and Livestock Marketing Ass'n that a tax, like that imposed by section 601.15, the proceeds of which are used primarily for generic advertising, is not governmental speech that is protected from the provisions of the First Amendment. In fact, the statutory scheme in Florida under which the excise tax is collected and expended for advertising is strikingly similar to that which the Supreme Court struck down in United Foods, in which the focus of the Court's analysis was the industry that was taxed and the primary use of the tax.
Under the provisions of the Florida Citrus Code, the Florida Citrus Commission is designated the head of the Department of Citrus. Its membership is composed completely of those who earn their living in the Florida citrus industry. The DOC has extensive, if not exclusive, control over its generic advertising and promotional activities. The money for this advertising and promotion comes only from the tax assessed by section 601.15. *834 This tax is assessed only on the Growers and others who produce and market citrus fruit. By law, approximately seventy-three percent of the money generated by this tax must be and is spent on advertising.
We reject the DOC's argument that the tax is part of a more comprehensive program governing citrus production and marketing, such as was upheld by the Supreme Court in Glickman. The Florida Citrus Code does not collectivize the citrus industry as described by the Court in Glickman. The DOC may set certain standards for the quality of citrus produced and marketed, but it does not set prices or restrict the quantity of citrus that can be produced or marketed.
We conclude that the statutory assessment and use of the tax imposed by section 601.15 compel speech that is prohibited by the First Amendment and therefore affirm the declaratory judgment.
Affirmed.
SALCINES, J., Concurs.
CASANUEVA, J., Concurs with opinion in which SALCINES, J., concurs.
CASANUEVA, Judge, Concurring.
Although I fully concur in the court's opinion, I believe the issue of generic advertising is not yet fully resolved. The Supreme Court of the United States has accepted for review Livestock Marketing Ass'n v. Department of Agriculture, 335 F.3d at 711. Furthermore, the Supreme Court of California recently reaffirmed that the generic advertising requirements of the California Plum Marketing Program do not violate the First Amendment, but the court remanded the case for further factual consideration of whether the program, which regulates commercial speech, can pass state constitutional muster under the intermediate scrutiny test of Central Hudson Gas & Electric v. Public Service Commission, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Gerawan Farming, Inc. v. Kawamura, 33 Cal.4th 1, 14 Cal.Rptr.3d 14, 90 P.3d 1179 (2004). Given these recent developments, it may be appropriate to keep this case in the appellate pipeline.
The Supreme Court has ruled that commercial speech is a form of communication protected by the First Amendment. For example, speech "which `does no more than propose a commercial transaction'" has been afforded constitutional protection. Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (quoting Pittsburgh Press Co. v. Human Relations Comm'n, 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)). Additionally, the First Amendment prohibits the government from compelling subsidies from individuals for speech to which they object. Abood v. Detroit Bd. of Educ., 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).
In this case, the issue of whether the legislative framework, including the box tax, unconstitutionally compels commercial speech or whether it merely represents Florida economic policy properly enacted by the legislature and administered by the Department of Citrus is presently answered by reviewing two decisions of the United States Supreme Court: Glickman, 521 U.S. at 457, 117 S.Ct. 2130, and United Foods, 533 U.S. at 405, 121 S.Ct. 2334. The factor distinguishing the cases appears to be the extent of the statutory regulatory framework. The more closely the framework approaches absolute governmental control of the industry, the more likely it is that the generic advertising will be regarded as economic regulation rather than abridgement of protected commercial speech, as in Glickman. Conversely, *835 the more closely the governmental regulation resembles a stand-alone commercial advertising program, the more likely it is that the program will be held unconstitutional as government-compelled commercial speech, as in United Foods. Stated in simpler terms, the issue is whether the governmental program, particularly the box tax on citrus products, funds governmental or commercial speech.
I turn now to the two critical decisions of the Supreme Court. In Glickman, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585, the issue was whether a requirement in the Agricultural Marketing Agreement Act of 1937 (AMAA) compelling financing of generic advertising violated the First Amendment. The Court reviewed the historical legislative purpose of the challenged legislation and determined that the Act's purpose was to establish and maintain orderly marketing conditions and fair prices for agricultural commodities. Two aspects of the AMAA's form of economic regulation should be noted. First, it controlled competition through marketing orders; second, those orders were exempted from the antitrust laws. These regulated markets were characterized by collective economic action imposed upon them rather than by independent, competitive choices commonly found in a free market system. In addition to the collective economic action, the legislation authorized research and development projects, established inspection procedures meant to insure uniform product quality, and imposed packaging requirements. To pay the program's expenses, the AMAA authorized assessments on the participating producers. A portion of the funds was used to pay advertising expenses, including propagation of the generic message that California summer fruits (nectarines, plums, and peaches) were delicious and wholesome foods. Glickman, 521 U.S. at 460, 117 S.Ct. 2130. It was this required expenditure of funds for promotional generic advertising that was challenged.
The Court ultimately concluded it was reviewing "a species of economic regulation" that was entitled to a strong presumption of validity. Glickman, 521 U.S. at 477, 117 S.Ct. 2130. Prior to reaching this conclusion, the Court determined that the First Amendment's prohibitions did not apply. Although there is a First Amendment "interest in not being compelled to contribute to an organization whose expressive activities conflict with one's `freedom of belief,'" (quoting Abood, 431 U.S. at 235, 97 S.Ct. 1782), the requirement "to pay the assessments cannot be said to engender any crisis of conscience." Glickman, 521 U.S. at 471-72, 117 S.Ct. 2130. The Court observed:
None of the advertising in this record promotes any particular message other than encouraging consumers to buy California tree fruit. Neither the fact that respondents may prefer to foster that message independently in order to promote and distinguish their own products, nor the fact that they think more or less money should be spent fostering it, makes this case comparable to those in which an objection rested on political or ideological disagreement with the content of the message.
Id. at 472, 117 S.Ct. 2130. Because the statute was designed to advance the economic interest of the producers as a group, it did not "warrant special First Amendment scrutiny." Id. at 474, 117 S.Ct. 2130.
The second case, United Foods, 533 U.S. at 405, 121 S.Ct. 2334, also involved a challenge to a regulatory scheme authorized by statute that, in part, mandated that certain product handlers fund generic advertising for mushrooms. The Mushroom Promotion, Research, and Consumer Information Act, enacted by Congress in *836 1990, permitted the Secretary of Agriculture to designate the membership of the Mushroom Council, which, in turn, could impose mandatory assessments on mushroom producers and importers. Most of the revenue generated by the assessments was used to promote mushroom sales. Writing for the majority, Justice Kennedy phrased the issue as "whether the government may underwrite and sponsor speech with a certain viewpoint using special subsidies exacted from a designated class of persons, some of whom object to the ideas being advanced." Id. at 410, 121 S.Ct. 2334. Recognizing that First Amendment values are at "serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side it favors," the Court concluded that "the compelled funding for the advertising must pass First Amendment scrutiny," id. at 411, 121 S.Ct. 2334, and invalidated the compelled assessments.
United Foods did not overrule Glickman. Although the Court wove a similar analytical thread through both decisions, by focusing upon the different regulatory programs it created a different fabric in each case. Importantly, the Glickman tree fruit program displaced many independent business activity functions with a collective economic framework independent of individual competitive choices and exempt from antitrust regulation. In contrast, the United Foods mushroom program featured a marketing scheme under which virtually all of the mandatory assessments collected were used for generic advertising. Otherwise, the mushroom growing business was left largely unregulated. In fact, "the statute [did] not require group action, save to generate the very speech to which some handlers object." United Foods, 533 U.S. at 415, 121 S.Ct. 2334. In striking down the statute, the Supreme Court concluded that "the mandated support is contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity." Id. at 413, 121 S.Ct. 2334.
Measuring the Florida statutory program in this context, I conclude that the threshold inquiry mandated by United Foods  whether there is some state-imposed obligation that makes group membership less than voluntary  has been met. Unlike such organizations as Rotary, the Republican or Democratic Parties, or Mothers Against Drunk Driving, the Florida citrus growers have no choice regarding membership; they are required by law to participate in the program. Because this is so, the decisions from the federal circuit courts of appeal are persuasive authority for the conclusion that the mandatory box tax violates the First Amendment's commercial speech protections. It is likewise clear that these cases restrict the choices of a government  whether state or national  in the economic regulatory field. In the case before this court, their rationale effectively operates to limit Florida's ability, through the exercise of its police powers, to preserve and maintain an industry of critical importance to its very economic well-being.[1]
Justice Holmes wrote that our "Constitution is not intended to embody a particular economic theory, whether of paternalism *837 and the organic relation of the citizens to the state or of laissez faire." Lochner v. New York, 198 U.S. 45, 76, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J., dissenting). The precedent that this court follows today raises the issue of whether the First Amendment favors a particular economic theory and suggests, given the current interpretations of Glickman and United Foods, that collectivism does not implicate the First Amendment while limited regulation of an industry does.
Finally, I note that the Supreme Court of California has recently attempted to reconcile Glickman and United Foods. In Gerawan Farming, 14 Cal.Rptr.3d 14, 90 P.3d at 1189, the court opined that "the compelled funding of commercial speech does not violate the First Amendment if it is part of a larger marketing program ... and if the speech is germane to the purpose of the program." Applying that rationale, the court concluded in part that the California Plum Marketing Program is "part of a larger cooperative regulatory program with substantial nonexpressive elements and therefore crosses the United Foods threshold." Id. at 29, 90 P.3d 1179 (citation omitted). Therefore, the California plum generic advertising program does not violate the First Amendment, but because it places restrictions on commercial speech, the court remanded for further factual development to ascertain whether those restrictions are part of a larger marketing program and are germane to the purpose of the program.[2] Whether the analytical framework proposed in Gerawan Farming is correct will not be answered until the United States Supreme Court speaks following its certiorari review of Livestock Marketing Ass'n.
SALCINES, J., Concurs.
NOTES
[1] Arguably, the unique and premiere importance of the citrus industry to the health, welfare, and economy of this state, as well as the virtually universal identification of Florida with the citrus industry, distinguishes this case from those in which a national economic regulation benefits only a particular industry (mushroom, beef, pork) with limited, if any, promotion of any other legitimate governmental interest.
[2] The Gerawan court required further fact-finding so that the "government will have an opportunity to prove that the speech at issue was in fact government speech." Gerawan, 14 Cal.Rptr.3d 14, 90 P.3d at 1196. And the court noted that the Supreme Court in United Foods refused to consider a similar government speech issue on the ground that it had not been raised in the federal Court of Appeals. Id. This observation undermines our conclusion in this case that Florida's generic citrus advertising is not protected government speech because the tax scheme generating the advertising is "strikingly similar to that which the Supreme Court struck down in United Foods."